

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 99-1223-CIV-GOLD

| | | |
|---|---|---|
| AMOCO OIL COMPANY, a<br>Maryland corporation, | ) | **MAGISTRATE JUDGE SIMONTON** |
| | ) | |
| Plaintiff, | ) | **AMOCO OIL COMPANY'S** |
| | ) | **MOTION IN LIMINE** |
| vs. | ) | **TO EXCLUDE OPINION** |
| | ) | **OF EXPERT, MONTE KANE** |
| CAROLINE GOMEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | / | |

Amoco Oil Company moves for entry of an order excluding the opinion offered by accountant Monte E. Kane. As set forth below, Mr. Kane failed to employ the same level of intellectual rigor in preparing his opinion that characterizes the practice of an expert in the relevant field. As a result, his opinion falls "outside the range where experts might reasonably differ".

I.

INTRODUCTION

Mr. Kane holds himself out as an expert in business in general *(Exhibit P to Gomez Schedule of Exhibits dated June 20, 2000, p .47)*, tax returns *(Exhibit P, p. 145)*, business valuations *(Exhibit P, p. 148)*, analysis of financial statements and audits *(Exhibit P, p. 150)*, and calculations of lost profits *(Exhibit P, pp. 150-151)*. He is not an expert in gas stations or gasoline operations *(Exhibit P, p. 88)*, gasoline fuel margins *(Exhibit P, p. 47)*, gas station marketing *(Exhibit P, p.47)*, studying what consumers are looking for at gas stations *(Exhibit P, p. 48)*, determining what is a comparable station *(Exhibit P, pp. 77-78, 136)*, determining the level of gallons a particular site should be selling *(Exhibit P, p. 88)*, or Amoco's operations *(Exhibit P, p. 147)*.

Mr. Kane opines that Gomez suffered damages between $662,508 and $1,576,003 regarding a single gasoline service station that Gomez abandoned after failing to achieve her desired profitability. These damages are made up of consequential damages. They take the form of (a) "lost profits" from May 16, 1997 to September 16, 2010 and (b) the "Initial investment in the gas station" that was not invested by Gomez or paid to Amoco, but was instead paid by non-party Rocabaja Corp. to non-party Gemar (*Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III; Exhibit 4 to Amoco's Notice of Filing dated May 30, 2000).*

Mr. Kane's opinion is inherently unreliable. It is littered with one unreliable method after the other. The damages figures are wildly inflated. For example, Mr. Kane ignores universally known financial principles by not reducing his projected lost profits to their present value. Mr. Kane does not stop here, but proceeds to base his calculations entirely on a business plan created on a boiler-plate Amoco form that Ms. Gomez can only distance herself from *("I didn't do this. I've never been in the business, nothing". Exhibit 6 to Amoco's Notice of Filing, Gomez depo. p. 119[1]).* Additional unreliable methods are used that are contrary to the undisputed record facts. Taken together, the errors in methodology, the speculative methods, and methods that are contrary to the record are so embedded in Mr. Kane's opinion that his opinion falls "outside the range where experts might reasonably differ". Mr. Kane has very simply failed to employ the same level of intellectual rigor in preparing his opinion that characterizes the practice of an expert in the relevant field.

---

[1] Gomez testified that the prior operator of the site, James Perez, helped her with the numbers ("*He [Jimmy Perez] offered to help me. I mean it was something that I didn't know the numbers or whatever they were asking*." Exhibit 7 to Amoco's Notice of Filing, Gomez depo. pp. 108-110).

## II.

## LEGAL STANDARD

Certain fundamental points regarding Mr. Kane's expert testimony are particularly relevant.

### A. **Exclusion of unreliable opinions**.

Expert testimony must be based on reliable methods or it shall be excluded. Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993) (focus of inquiry is on methodology); Frymire-Brinati v. KPMG Peat-Marwick, 2 F.3d 183, 186-87 (7th Cir. 1993) (applying Daubert to accountant's expert testimony); Mitchell v. Gencorp, 165 F.3d 778, 782 (10th Cir. 1999) (any step that renders expert testimony unreliable also renders it inadmissible).

Expert testimony must be excluded where it falls "outside the range where experts might reasonably differ". Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152-53 (1999). An expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Id.

### B. **Ignoring the time value of money is error**.

Expert testimony must be excluded if it opines as to future lost profits without reducing them to their present value. Cf. Chesapeake & Ohio Railway Co. v. Kelly, 241 U.S. 485, 491 (1916) (in computing damages for future benefits, an adequate allowance must be made for the earning power of the money); Seaboard Coast Line R. Co. v. Burdi, 427 So.2d 1048, 1050 n.4 (3d DCA 1983) (recovery for future monetary losses limited to present value); Burger King Corporation v. Barnes, 1 F.Supp. 2d 1367, 1369 (S.D. Fla. 1998) (damages awarded after they had been reduced to their present value).

**C.  Improperly speculating**.

Expert testimony must be excluded if it is based on speculation. <u>JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.</u>, 1998 WL 175888, *6 (E.D. Pa. 1998), <u>aff'd.</u>, 178 F.3d 1279 (3d Cir. 1999) (excluding accountant's expert testimony based on sales projection); <u>Target Market Publ'g, Inc. v. ADVO, Inc.</u>, 136 F.3d 1139, 1144 (7th Cir. 1998) (excluding testimony of damages expert based on optimistic assumptions); <u>Joy v. Bell Helicoptor Textron, Inc.</u>, 999 F.2d 549, 568 (D.C. Cir. 1993) (damage expert excluded due to speculative assumption deriving from business plans).

**D.  Improperly ignoring facts in the record**.

Expert testimony must be excluded if it improperly ignores facts in the record. <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 242 (1993) (error to permit opinion contradicted by indisputable record facts); <u>JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.</u>, 1998 WL 175888, *6 (E.D. Pa. 1998), <u>aff'd.</u>, 178 F.3d 1279 (3d Cir. 1999) (excluding accountant's expert testimony that ignored existing data). <u>See also</u>, <u>Seminole County v. Sanford Court Investors, Ltd.</u>, 743 So. 2d 1165, 1169 (Fla. 5th DCA 1999) (error to permit tenant to present evidence of business damages for period any greater than duration of lease); <u>E.J. Salas v. State of Florida</u>, 220 So. 2d 378, 380 (Fla. 1st DCA 1969) (future business damages limited to term of one year for year-to-year lease).

**E.  Improperly seeking double recovery**.

Expert testimony must be excluded if it will seek an improper double recovery for a party. <u>JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.</u>, 1998 WL 175888, *9 (E.D. Pa. 1998), <u>aff'd.</u>, 178 F.3d 1279 (3d Cir. 1999) (excluding accountant's expert testimony that calculated damages based on addition of both "Unrecovered Investment" and "lost profits" on grounds that these are alternative measures of damages).

**F.  Improper scope to expert testimony**.

Expert testimony regarding damages must be excluded if it is not limited to the damages that were caused by the alleged improper conduct. Fox v. Mazda Corp. of America, 868 F.2d 1190, 1194-95 (10th Cir. 1989) (excluding testimony of damages expert where testimony did not limit damages to losses attributed to discriminatory conduct by defendant).

## III.

## MR. KANE'S METHODOLOGY

Several of Mr. Kane's unreliable methods are set forth below. Citations are set forth below to Section II of this brief and the authorities therein that show the unreliability of Mr. Kane's opinion.

---

**Method 1:**          *Mr. Kane calculates business damages from May 16, 1997 to September 16, 2010 without ever reducing them to a present value.*

This material omission renders Mr. Kane's opinion plainly incorrect and unreliable. It so inflates the calculation that Mr. Kane attests to under oath that it falls "outside the range where experts might reasonably differ" (Section II.A). This can hardly be characterized as Mr. Kane employing in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (Section II.A).

Notably, Mr. Kane is not merely using an unpopular method employed by a minority of those in the field. Rather, it is universally known in the financial and legal community that future cash flows cannot be valued without being reduced to present value (Section II.B); (*Exhibit 1 attached herewith, Affidavit of Adam Marcus ¶6 "The present value method forms the cornerstone of business or equity interest valuations" citing to Argenti, The Portable MBA Desk Reference*

*(1994).* This error shows Mr. Kane should be prevented from presenting an opinion based on an incorrect and unreliable method.

| | |
|---|---|
| **Method 2:** | *$768,000 of the $1.576 million is derived from assuming 2.16 million gallons of fuel per year would be sold at the subject site between May 16, 1997 and September 16, 2010 at a gross margin of 8 cents per gallon to Gomez (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.C.).* |

This unreliable method relies upon several assumptions that are speculative and contrary to the undisputed record (Section II.C and II.D).

*Annual volume of gallons of fuel*: Mr. Kane acknowledges he has no information that the site has ever achieved an annual volume of 2.16 million gallons or anything near it *(Question: Do you know if this station has ever had an annual volume of in the excess of 1.5 in a year? Answer: I don't know that.  Exhibit P, Kane depo. pp.130).* The only actual volumes Mr. Kane can cite to are 1.07 million gallons for 1986; 1.2 million gallons for 1987; 1.1 million gallons for 1988; 675,000 gallons for the partial year from May through December 1997;  1.1 million gallons for 1998; and 235,000 for the quarter year from January through March 31, 1999 *(Exhibit P, Kane depo. pp.128-130)*

Instead of actual volumes or employing any analysis (which would be beyond the scope of his expertise), Mr. Kane chooses to rely upon a one-page, boiler-plate, Amoco form dated February 28, 1989 that states only "Estimated Sales". *(Exhibit 2 attached herewith, and Exhibit P, Kane depo. pp. 125-128).* From this over ten-year old form, Mr. Kane speculates that Amoco must have thought the station could have achieved 2.16 million gallons per year as of 1989, therefore why should he not make the same assumption in the year 2000. Mr. Kane does not know anything about the circumstances regarding this document's creation, what it was intended to say, or what it means *("I don't know the full significance of it" Exhibit P, Kane depo. pp. 126-*

*127)*. This can hardly be characterized as Mr. Kane employing in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (Section II.A). This assumption renders Mr. Kane's calculations and method as no more than rank speculation.

*Term for calculation damages*: Mr. Kane next assumes Gomez would have operated the site she abandoned on March 31, 1999 through September 16, 2010 (*Exhibit P, Kane depo. pp. 122-124)*. To get there, Mr. Kane's method is to assume that Gomez would exercise a four-year renewal in September 2002. Mr. Kane then assumes yet another four-year renewal in September 2006. Mr. Kane's method also assumes that Amoco would and could have renewed its underlying lease that expires in November 2005 *("the presumption is that Amoco would be able to negotiate a continuation of their lease with the landowner" Exhibit P, Kane depo. pp. 122-123)*. Each of these assumptions render Mr. Kane's methods speculative. It also ignores undisputed facts in the record that Gomez' lease expired in 2002, even in the absence of Gomez' March 31, 1999 abandonment (Section II.C and II.D).

*Fuel margin contrary to record evidence*: Mr. Kane next assumes 8 cents per gallon as a gross margin that Gomez can realize (*Exhibit P, Kane depo. pp.111-112)*. Contrary to Mr. Kane's assumption, the undisputed record shows that Gomez is entitled to only 3.4 cents per gallon pursuant to the Commission Marketer Agreement that Gomez admits is the operative agreement (*Exhibit 3 to Amoco's Notice of Filing, ¶1 of Amended Answer, Affirmative Defenses, Counterclaim and Demand for Jury Trial; Exhibit 6 to Amoco's Notice of Filing, Gomez depo. pp.135-136 acknowledging that Gomez' sole compensation was 3.4 cents per gallon)*. Mr. Kane cannot reliably employ a method that uses 8 cents per gallon gross margin when Gomez is undisputedly entitled to only 3.4 cents per gallon (Section II.D). Again, Mr. Kane has failed to employ in reaching his

opinions "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (Section II.A).

| | |
|---|---|
| **Method 3:** | *$72,585 of the $1.576 million is computed by multiplying Gomez' 22 ½ month tenure at the site by $3,226 per month of projected profits (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.A.).* |

Mr. Kane's next method assumes that Gomez's "business plan" is a reliable basis upon which to measure damages (*Exhibit V to Gomez Schedule of Exhibits, Kane report section V.*). However, Gomez testimony hardly renders this "business plan" a reliable document (*"it was something I didn't know the numbers or whatever they were asking" Exhibit 7 to Amoco's Notice of Filing, Gomez depo. pp. 108-110*). Mr. Kane is not an expert in gas stations operations, determining the volume of gallons a particular site should be selling, or in determining fuel margins (*Exhibit P, Kane depo. pp.88, 47*). Mr. Kane has no expertise to determine the reasonability or reliability of any assumptions employed in the preparation of the "business plan," yet he accepts it in its totality as a reliable basis upon which to render his opinion (*Exhibit P, Kane depo. pp. 85-87*).

In addition to his blind acceptance of the "business plan", Mr. Kane ignores the actual results of the site (*Exhibit O to Gomez Schedule of Exhibits, Kane report, Chart on page VI "Actual vs. Projected Net Income"*). These actual results show the site did not achieve the goals of the "business plan" even during the June through August 1997 period when Gomez concedes that she did not experience any of the fuel dispensing problems that she alleges as the reason she abandoned the site (*Question: How were the fuel sales between May 27 and the time the construction began? Answer: "They were fine". Exhibit 6 to Amoco's Notice of Filing, Gomez depo. pp.197*). Mr. Kane's method of simply relying on an unsigned, unverified, "business plan" is simply unreliable and speculative (Section II.A and II.C). It also ignores actual results (Section II.D). Blind reliance on the

"business plan" and turning a blind eye to actual results hardly shows that Mr. Kane employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (Section II.A).

| | |
|---|---|
| **Method 4:** | *$72,043 of the $1.576 million is computed by claiming the entirety of the alleged losses Gomez claims during her 22 ½ month tenure at the site as damages (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.A.).* |

This method incorrectly assumes the entirety of Gomez' claimed losses, which include non-cash expenses of depreciation and amortization, are recoverable (*Exhibit P, Kane depo. pp.119-121*). This method is flawed. For example, non-cash expenses of depreciation and amortization which compose part of the $72,043 also compose a part of the "initial" $220,000 investment for which Gomez also seeks a complete recovery. Mr. Kane's unreliable method has the effect in this instance of providing Gomez with an impermissible double recovery (Section II.E) (*Exhibit P, Kane depo. pp.119-121*).

| | |
|---|---|
| **Method 5:** | *$258,080 of the $1.576 million is computed by multiplying the $3,226 from the unsigned, unverified "business plan" through the November 30, 2005 expiration of Amoco's ground lease with the owner of the site (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.A.).* |

This method assumes the reliability of the unreliable "business plan" previously addressed regarding Mr. Kane's other methods. It also assumes that Gomez would have operated the site she abandoned on March 31, 1999 through the original term of September 16, 2002. Mr. Kane then assumes yet another four-year renewal that would have expired in November 2005 when Amoco's underlying ground lease expires. Each of these assumptions render this method unreliable,

speculative, and contrary to undisputed facts in the record (Section II.A, II.C, II.D) (*Exhibit O to Gomez Schedule of Exhibits, Kane report, Section II.I.A.*).

---

**Method 6:**     *$220,000 of the $1.576 million is computed by counting funds paid by non-party Rocabaja to non-party Gemar for the assets and goodwill of the subject site (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.A.).*

This method ignores the record. It seeks recovery for Gomez of amounts paid by non-party Rocabaja to non-party seller Gemar (*Exhibit 4, to Amoco's Notice of Filing*). Mr. Kane's method is therefore is contrary to the undisputed record facts (Section II.D). It also results in Gomez seeking an impermissible double recovery. Gomez cannot simultaneously claim loss of the "Initial Investment" and "Lost Profits (Section II.E) (*Exhibit O, to Gomez Schedule of Exhibits, Kane report, Section IIIA* ); JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc., 1998 WL 175888, *9 (E.D. Pa. 1998), aff'd., 178 F.3d 1279 (3d Cir. 1999) (excluding accountant's expert testimony that calculated damages based on addition of both "Unrecovered Investment" and "lost profits" on grounds that these are alternative measures of damages). Gomez can also not claim the "Initial Investment" and at the same time record these funds as expenses which compose part of the "Net Losses" of $72,043 she seeks to recover (Section II.E) (*Exhibit P, Kane depo. pp. 119-121* ).

---

**Method 7:**     *$185,495 of the $1.576 million is computed by by multiplying the $3,226 from the unsigned, unverified "business plan" through September 16, 2010 (Exhibit O to Gomez Schedule of Exhibits, Kane report, Section III.B.).*

This method assumes Gomez would have operated the site she abandoned on March 31, 1999 through September 16, 2010 and that the "business plan" is a reliable basis upon which to

measure damages. Mr. Kane's method is speculative and contrary to the record for the reasons previously addressed regarding Mr. Kane's other methods.

| | |
|---|---|
| **Method 8:** | *The entirety of the $1.576 million is based on an assumption that all these damages were all caused by the "slow flow" and/or "no flow" that Gomez blames Amoco for.* |

This method assumes that Amoco caused $1.576 million in ostensible damages claimed by Gomez. Mr. Kane should not be allowed to present any damages unless there is a specific basis to link the claimed damages to conduct of Amoco. Absent this, it is error to allow Mr. Kane to simply render what is no more than an unreliable business valuation (Section II.F).

For example, Mr. Kane does not perform any analysis of the possible impact the claimed "slow flow" had on Gomez' operation of the station. Mr. Kane does not compare fuel sales for June 1997 to August 1997 (the time during which Gomez claims there was no "slow flow") to the fuel sales when the so-called "slow flow" occurred.

Instead, he assumes a complete and total destruction of the business and also assumes that the entire destruction must have been caused by Amoco. Mr. Kane ignores Gomez' own voluntary abandonment of the business as a factor in its non-operation. He also ignores competition in the relevant gas service station market since he is not qualified to make such an evaluation. These flaws in his opinion also render it unreliable.

## V.

## CONCLUSION

Mr. Kane can hardly be characterized as employing in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". His opinion is unreliable and falls outside the range where experts might reasonably differ. Mr. Kane's opinions should be excluded.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by U.S. mail this 18th day of August, 2000, to: Raul E. Garcia, Jr., Esq., Raul E. Garcia, Jr., P.A., Attorneys for Defendant, 9200 S. Dadeland Boulevard, Suite 316, Miami, FL 33156.

> HEINRICH GORDON HARGROVE
> WEIHE & JAMES, P.A.
> Attorneys for Plaintiff
> 500 East Broward Boulevard, Suite 1000
> Ft. Lauderdale, FL 33394-3092
> (954) 527-2800
> (954) 524-9481 (fax)
>
> By:_____
> Moises Melendez, Esq.
> Florida Bar No. 908835
> John R. Hargrove, Esq.
> Florida Bar No. 173745
> Cristina M. Pierson, Esq.
> Florida Bar No. 984345

G:\LAW\82041\028\M-LIMINE RE EXP TEST PURSUANT TO DAUBERT-02.doc
8/18/00 1:48 PM

EXHIBIT

*1*

Blumberg No. 5208

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 99-1223-CIV-GOLD

AMOCO OIL COMPANY, a
Maryland corporation,

Magistrate Judge Simonton

Plaintiff,

**AFFIDAVIT OF ADAM MARCUS**

vs.

CAROLINE GOMEZ,

Defendant.

_____/

STATE OF GEORGIA

COUNTY OF

1.    My name is Adam Marcus. I am employed by Amoco Oil Company as a Regional Sales Manager.

2.    Training and education: I hold a Bachelor of Science in Finance from the University of Maryland, College Park, Maryland, 1988. I also hold a Masters of Business Administration in Marketing and Finance from the University of Tampa, Florida, 1994. In addition to this training and education, I have also developed additional financial knowledge, skill, and experience through work involving financial responsibility in and about the gasoline service station industry and other business.

3.    Financial experience: I have developed this knowledge, skill, and experience through various positions at BP Amoco, Amoco Corporation, and Safelite Glass Corporation. Theses positions include Market Manager for Retail Business Units at Amoco; Operations Consultant for Marketing Business Group(s) at Amoco; District Manager for Safelite; Regional Sales Support Manager at Amoco for the Florida Region; Regional Administration and Analysis

Manager for the United States Southeast Business Unit at BP Amoco; and Regional Sales Manager for the United States Southeast Business Unit for BP Amoco.

4.    I have had significant responsibility of a financial nature in these positions. I have from time to time analyzed future cash flow streams in connection with decisions pertaining to the acquisition or divestment of ongoing business operations. I have from time to time analyzed cash flow streams in connection with capital investment decisions.

5.    <u>Present value of money (time value of money)</u>: It is a fundamental principle of finance that money has a time value. In other words, a dollar tomorrow is not necessarily worth a dollar today. This is a universal and well-recognized principle of finance when measuring the present value of a future payment or stream of payments.

6.    For example, Downes and Goodman, <u>Barron's Finance & Investment Handbook</u> (4th Ed. 1995) discusses present value:

> PRESENT VALUE: value today of a future payment, or stream of payments, discounted at some appropriate compound interest – or discount – rate. For example, the present value of $100 to be received 10 years from now is about $38.55, using a discount rate of 10% interest compounded annually. <u>The present value method, also called the DISCOUNTED CASH FLOW method is widely used in corporate finance</u> to measure the return on a CAPITAL INVESTMENT project. . . . <u>Also called *time value of money*</u>. (emphasis added).

7.    Argenti, <u>The Portable MBA Desk Reference</u> (1994) also discusses present value:

> PRESENT VALUE: The current value of a future payment or stream of payments. Present value is calculated by applying a discount (capitalization) rate to the future payment(s). . . . <u>The present value method forms the cornerstone of business or equity interest valuations</u> and is also referred to as the "discounted cash flow method" or the "discounted earnings method." It is widely used by companies and investors to determine the fair market value of a potential investment. . . . (emphasis added).

8.    <u>Mr. Kane's report</u>: I have reviewed the report dated May 23, 2000 submitted by Monty E. Kane, C.P.A.. It appears from the report, particularly at pages two and three where all the damage calculations are performed, that Mr. Kane simply multiplied a projected alleged lost profit of $3,226.00 per month through September 16, 2010 for the service station located at 7070 West Flagler Street, Miami, Florida. Mr. Kane's calculations do not take into account the time value money, i.e. the present value of the future stream of the alleged lost profits. Mr. Kane instead simply valued the alleged lost profits which he calculates would occur in 2010 in the same way as he valued alleged lost profits for earlier years.

9.    I do not believe there is any accepted school of thought that would explain the failure to account for the time value of money in this calculation.

10.    In my opinion, Mr. Kane's failure to account for the time value of money drastically inflates the damages calculation in his report.

11.    It is also my opinion that his failure to account for the time value of money in his report makes it so that the opinion falls outside the range where experts might reasonably differ.

12.    It is my understanding that the scope of my testimony may be limited pursuant to certain mutual limitation of remedies provisions in the contracts between the parties in this case.

Case no. 99-1223-CIV-GOLD

FURTHER AFFIANT SAYETH NAUGHT.

_____
ADAM MARCUS

STATE OF GEORGIA
COUNTY OF

    Sworn to (or affirmed) and subscribed before me this _7th_ day of _July_, 2000, by ADAM MARCUS.

_____
Notary signature
Notary Public, Cherokee County, Georgia
My Commission Expires Sept. 10, 2003

SEAL

                Personally known               ✓ _____

         or Produced Identification          _____

    Type of Identification Produced      _____

G:\law\82041\028\AFFID-MARCUS.doc

4



JUL.-20'99(TUE) 14:55    AMOCO   ROLEUM PROD          TEL:551...1          P.016

**Request for Approval to Enter Into a New Lease/ Renew, Modify or Non-Renew an Existing Lease**
28-281 (6-87)

**Amoco Oil Company**

Date of request: 2/28/89

| Zone | District |
|---|---|
| East | Ft. Lauderdale |

| R. K. No. | B. S. No. |
|---|---|
| | 10345 |

Location Street Address
7070 W. Flagler St.

City, State, Zip Code
Miami, Fla.  33135

**Type of Account:**

• Service Station
☐ Ground Lease – LOCI (class 14)
☐ 3 Party LOPO (class 16)
☐ 2 Party LOPO (class 17)

• Not Service Station
☐ Terminal Lease
☐ Bulk Plant
Other (specify)

| | Present Arrangement | Proposed Arrangement |
|---|---|---|
| | | ☐ Lease Renewal   ☐ New Account   ☒ Modification of Lease |

| Lease Parties | Lessor  Conrad Kies  Kies Oil Company  Sublessee  Conrad A. Kies | Lessor  Same  Sublessee |
|---|---|---|

| Period | From 10/1/84  To 9/30/89 | From 3/1/89  To 2/28/94 |
|---|---|---|

**Gasoline Sales**

Present Arrangement – Actual Sales

| Period (dates) | Gallons |
|---|---|
| 1986 | 1,077,631 |
| 1987 | 1,200,168 |
| 12 Months Ending 1988 | 1,183,131 |

Proposed Arrangement – Estimated Sales

| | Gallons |
|---|---|
| First Year | 2,160,000 |
| Second Year | |

**Rent**

Present:
Amoco Pays   3.0¢ per gal.
Sublessee Pays Amoco   0.5¢ per gal.

Proposed:
Amoco Pays   2.5¢ per gal.
Sublessee Pays Amoco   $1 per year

**Renewals**

Present:
Total Years 5 — Renewal at lessor's option   1-3   2-1   Year(s) at a time
☑ Same Rent All Renewals   or   Renewal Rent Changes ▶
1st Renewal / 2nd Renewal / 3rd Renewal

Proposed:
Total Years 5 — 5 at Amoco's option   Year(s) at a time
☑ Same Rent All Renewals   or   Renewal Rent Changes ▶
1st Renewal / 2nd Renewal / 3rd Renewal

**Purchase Option**

Present: First Refusal
Proposed: First Refusal

**Taxes**

Present: ☐ Paid by Amoco   ☒ Paid by Lessor   Other (specify)
Proposed: ☐ Paid by Amoco   ☒ Paid by Lessor   Other (specify)

**Maintenance**

Present: ☐ Paid by Amoco   ☒ Paid by Lessor   Other (specify)
Proposed: ☐ Paid by Amoco   ☒ Paid by Lessor   Other (specify)

**Length Notice Required**

Present: No. of Days to Cancel / Action Date
Proposed: No. of Days to Renew / Action Date

| | Rent | P.V. | Prepared By |
|---|---|---|---|
| Present | 26.7 | $ | Date |
| Proposed | Rent $ | P.V. $ | Date |

Investment: Proposed Expenditure per Form 197 or Form 44 ▶ $

☐ Renew        ☐ Do Not Renew

Recommended   [signature]   J.D. Robbins , District Manager

Approved   Manager, Capital Investment

**Amoco2631**

82041.028